*Notice:  This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CHLOE W., | ) | |
| | ) | Supreme Court No. S-15351 |
| Appellant, | ) | |
| | ) | Superior Court No. 1JU-10-00053 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF HEALTH & SOCIAL SERVICES, | ) | No. 6965 – November 7, 2014 |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Louis J. Menendez, Judge.

Appearances:  Olena Kalytiak Davis, Anchorage, for Appellant.  David T. Jones, Senior Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before:  Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.
BOLGER, Justice, concurring.

## I.	INTRODUCTION

Chloe W.[1] appeals the termination of parental rights to her three-year-old son Timothy, an "Indian child"[2] under the Indian Child Welfare Act of 1978 (ICWA). She claims the trial court erred by: (1) relying too heavily on a stipulation filed after the close of evidence, which Chloe contends was the result of ineffective assistance of counsel; (2) finding that Chloe had not remedied the conduct that placed Timothy at risk; (3) finding that OCS made active efforts to reunify the family; and (4) finding that terminating Chloe's parental rights was in Timothy's best interests. Because the trial court's findings are amply supported by the record and its legal rulings are correct, we affirm the trial court's order terminating Chloe's parental rights to Timothy.[3]

## II.	FACTS AND PROCEEDINGS

Chloe lives in Juneau and is a member of the Tlingit and Haida Tribes of Alaska. As a child she suffered physical, emotional, and sexual abuse, as well as abandonment. Chloe was reported to have learning disabilities at school, and she dropped out in the eleventh grade. She worked sporadically over the years but has been unemployed since 2004. At age 19 Chloe lost her first child shortly after his birth due to a congenital heart defect and premature lung development. She started to take Xanax in 2008, when she was prescribed a high dosage for anxiety, in addition to Abilify and Neurontin for mood stabilization. In August 2009 Chloe began treatment with psychiatrist Dr. Paul Topol, who diagnosed her with depression and substance abuse.

---

[1]	We use pseudonyms to protect the family's privacy.

[2]	*See* 25 U.S.C. § 1903(4) (2012).

[3]	Timothy's father voluntarily relinquished his parental rights on May 30, 2012.

Dr. Topol continued the Xanax prescription and, because Chloe told him she was addicted to "pain killers," he prescribed Suboxone, an opiate maintenance drug. When Chloe became pregnant with Timothy, Dr. Topol continued her prescriptions to avoid serious health risks. Dr. Topol treated Chloe monthly until August 2013.

Timothy was born prematurely on August 1, 2010, at Alaska Native Medical Health Center in Anchorage. Timothy tested positive at birth for benzodiazepines, consistent with Xanax. When health professionals noticed that Chloe was lethargic and drowsy, they called OCS because they were concerned that she might drop the baby. Chloe signed an OCS Protective Action Plan. OCS contemplated placement of Timothy in a relative's home, and ultimately, Chloe and Timothy moved in with the Campbells, Chloe's aunt and uncle who live in Juneau.

On August 17 OCS filed a Petition for Adjudication of Child in Need of Aid and for Temporary Custody, based on reports that Chloe was uncooperative, heavily medicated, and unable to tend to Timothy's basic needs. Meanwhile, Timothy was experiencing symptoms of withdrawal, such as elevated respiration, high temperatures, and a mild increase in muscle tone. The court awarded OCS temporary custody of Timothy and continued his placement with the Campbells. But the relationship between Chloe and the Campbells became strained and adversarial, so Chloe moved into public housing.

On September 25 Juneau police responded to a report that Chloe was suicidal. Chloe's visitation was reduced due to further reports of drowsiness and impairment from Timothy's doctor, OCS workers, and Juneau police. OCS recommended medical detoxification, working with Dr. Topol on mental health alternatives to medication, and various outpatient counseling. On November 2, due to lack of progress, OCS changed Timothy's permanency plan to adoption. On December 14 Superior Court Judge Patricia A. Collins adjudicated Timothy a child in

need of aid under AS 47.10.011(6), (9), and (10)[4] but concluded that adoption would not be appropriate as a permanency goal after only 90 days, so the goal was shifted to reunification.

At a disposition hearing on March 30, 2011, OCS stated that it had stopped receiving reports of drowsiness, and Chloe's attorney told the court that Chloe had weaned herself off Xanax and was following her case plan. The court continued the permanency goal of reunification and granted OCS continuing custody for up to two years. But in August and September Chloe again showed signs of being intoxicated or heavily medicated. OCS continued to work with Chloe to comply with her case plan. Concerned that Chloe's home was unsanitary, a social worker drove Chloe to pick up a carpet cleaner and purchased and delivered cleaning supplies to her home. Because Chloe would not allow OCS to inspect her home, OCS would not supervise in-home visits.[5]

On April 4, 2012, OCS filed a Petition for Termination of Parental Rights, alleging that Timothy was not safe with Chloe because of her recurrent, severe depression, borderline personality disorder, and pain-pill-seeking behavior. After the termination trial, held in August 2012, Superior Court Judge Louis J. Menendez denied the petition. The superior court found that Timothy remained a child in need of aid under

---

[4]    AS 47.10.011 provides in pertinent part that the court may find a child a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to any of the following: (6) substantial physical harm or risk of harm due to the parent's conduct; (9) conduct by the parent has subjected the child to neglect; or (10) the parent's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, which has resulted in a substantial risk of harm to the child.

[5]    OCS approved in-home visits supervised by the Tribe for three hours per day, three days per week from May through July 2011 but these visits were discontinued because the Tribe was no longer available to provide services. Chloe did have in-home visits supervised by OCS in 2012 and early 2013.

AS 47.10.011(10) and AS 47.10.011(11).[6] But the superior court reasoned that termination was not in Timothy's best interests: Chloe had been a consistent part of Timothy's life, Timothy was a healthy child, and there was reason to believe that Chloe could continue to stabilize and grow as a parent and that with careful planning and counseling, Timothy could transition into Chloe's home. The superior court further found that OCS had not presented evidence beyond a reasonable doubt that Timothy was likely to suffer serious emotional or physical harm, and that "renewing in-home visitation and parenting instruction, continuing mental health therapy for [Chloe,] and a gradual and specific transition plan towards reunification with [Timothy] may obviate the need for termination." The superior court fashioned another plan for the parties and committed to conducting monthly review hearings to monitor Chloe's progress in meeting the requirements of her detailed case plan.

In May 2013 OCS social worker Carol Graham filed a Second Petition for Termination of Parental Rights, asserting that despite her sustained and concerted efforts to engage Chloe in the case plan to facilitate reunification, Chloe had not made sufficient progress. The petition alleged that Chloe continued to be evasive about which medications she was taking and to exhibit signs of drug-seeking behavior. OCS submitted evidence that Chloe lacked the skills necessary to parent adequately and had not participated in the recommended parenting classes. OCS submitted to the court a psychological evaluation of Chloe, prepared by clinical psychologist Dr. Elisa Youngblood, based on her meetings with Chloe in March 2013. Dr. Youngblood's report stated that Chloe was "likely to be irresponsible and engage in antisocial behavior"

---

[6]     AS 47.10.011(11) provides that a child may be found in need of aid if the court finds by a preponderance of the evidence that the parent has a mental illness, serious emotional disturbance, or mental deficiency that puts the child at substantial risk of injury.

and "to rebel against authority, have turbulent family relationships, and blame others for her problems." It was Dr. Youngblood's impression that Chloe "ha[d] relapsed on taking too much prescribed medication to the point that her parenting would be significantly impaired and the safety of her son would be jeopardized." Dr. Youngblood recommended medical detoxification and then, due to the severity and complexity of Chloe's substance abuse history, full participation in an inpatient or residential treatment program for one year. Chloe did not participate in the recommended treatment.

The second termination trial took place in July 2013. The superior court incorporated the prior proceedings and heard additional testimony from a number of witnesses. Chloe testified about her desire to care for her son, her work with parenting coach Martin Tyska of Catholic Community Services, and the efforts she made to improve her life and make sacrifices for her son. She discussed her mental health treatment and medications, explaining that her speech sounds slurred when she is sleep deprived. Dr. Youngblood, Tyska, and OCS representatives Carol Graham and Kristina Weltzin testified about occasions in 2013 when Chloe was inappropriately hostile, appeared intoxicated, or otherwise showed signs of a dependence disorder.

Dr. Topol testified that he had treated Chloe continuously since 2009. He discussed Chloe's mental health issues, as well as her treatment and medication management. Dr. Topol stated that, if taken as prescribed, Chloe's medication would not cause someone to be overly sleepy or lethargic or to slur her speech. Dr. Topol testified that while Chloe was continuing to make progress as an outpatient, she still struggled with impulsivity and anxiety, and more intensive therapy would help.

In August 2013 OCS filed a motion to reopen the testimony under Alaska Civil Rules 59(a) and 60(b)(2), based on new evidence that Dr. Topol had discharged Chloe from treatment because she had been dishonest with him and was using duplicate prescriptions. Rather than taking live testimony from Dr. Topol, the parties entered a

stipulation about Dr. Topol's new information, adding that Chloe denied any wrongdoing.

In September 2013 the trial court granted the second petition to terminate Chloe's parental rights to Timothy, based on its determination that Chloe was in relapse and thus presented a serious, substantial risk that Timothy would be exposed to danger. The superior court noted that multiple sources reported that Chloe continued to misuse her medications, missed numerous appointments, refused to attend the recommended treatment, and appeared to be receiving prescriptions from separate sources. The superior court emphasized that Chloe needed but refused inpatient treatment and that her personality disorder likely would interfere with her ability to meet Timothy's needs. The superior court remarked that it had been a close call whether termination would be in Timothy's best interests after the first trial, but it was no longer a close call. The superior court issued written findings and conclusions and ordered termination of Chloe's parental rights and responsibilities to Timothy. It found clear and convincing evidence that Timothy was a child in need of aid under AS 47.10.011(10) and AS 47.10.011(11), that Chloe had not remedied the conduct or conditions that put Timothy at substantial risk of harm, and that OCS had made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the family. The superior court further found beyond a reasonable doubt, relying on the testimony of qualified experts under ICWA, that returning Timothy to Chloe likely would result in serious damage to Timothy. The court concluded that Timothy's best interests would be promoted by terminating Chloe's parental rights because there was severe danger in moving him back and forth, and he needed and deserved a permanent and stable placement, which could not be achieved by continuing Chloe's parental rights. Chloe appeals.

## III. STANDARD OF REVIEW

Before terminating parental rights under ICWA and the Child in Need of Aid (CINA) statutes and rules, the superior court must find by clear and convincing evidence that the child has been subjected to conduct or conditions described in AS 47.10.011;[7] that the parent has not remedied, or has not remedied within a reasonable time, the conduct or conditions in the home that place the child at substantial risk of physical or mental injury;[8] and in the case of an Indian child, that active but unsuccessful efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family.[9] ICWA also requires that the trial court find, "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[10] Finally, the trial court must determine by a preponderance of the evidence that "termination of parental rights is in the best interests of the child."[11]

---

[7] AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

[8] AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(i)-(ii).

[9] 25 U.S.C. § 1912(d) (2012); CINA Rule 18(c)(2)(B).

[10] 25 U.S.C. § 1912(f); *see also* CINA Rule 18(c)(4).

[11] CINA Rule 18(c)(3); *see also* AS 47.10.088(c).

In CINA cases, we review a trial court's factual findings for clear error[12] and questions of law de novo.[13] Factual findings are clearly erroneous if review of the entire record leaves us with "a definite and firm conviction that a mistake has been made."[14] Whether the trial court erred in determining that OCS made active but unsuccessful efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family is a mixed question of fact and law.[15]

## IV. DISCUSSION

### A. The Trial Court Did Not Err In Considering The Stipulation Regarding Dr. Topol's Proposed Testimony, And Entering Into The Stipulation Did Not Amount To Ineffective Assistance Of Counsel.

After the evidence at the second termination trial closed, Dr. Topol informed OCS that he had discharged Chloe from treatment, and OCS moved to reopen the evidence to present Dr. Topol's testimony. In lieu of requiring that Dr. Topol testify in court, the parties entered into a stipulation providing as follows:

> Between the close of evidence in the second trial in the above-mentioned case and August 9, 2013, Dr. Paul Topol, MD discharged [Chloe] as a patient and is no longer treating or providing prescriptions to [Chloe]. Dr. Topol sent a letter to the Attorney General's office providing this information and indicating that this action was taken because he received

---

[12] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012) (citing *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103 (Alaska 2011)).

[13] *Id.* at 428 (citing *Christina J.*, 254 P.3d at 1104).

[14] *Id.* at 427-28 (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)) (internal quotation marks omitted).

[15] *Christina J.*, 254 P.3d at 1104 (citing *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009)).

information that duplicate prescriptions were filled in Wasilla, Alaska, rather than destroyed. [Chloe] denies any wrongdoing.

The trial court relied in part on this stipulation to find that Chloe had relapsed.

Chloe now contends that the trial court gave improper weight to the parties' stipulation to Dr. Topol's proposed testimony and that her attorney's decision to enter the stipulation amounted to ineffective assistance of counsel. OCS responds that the stipulation was properly submitted in lieu of testimony and that any error was harmless because the superior court clearly relied on a broad base of evidence in reaching its decision and not just the statements in the stipulation.

The trial court did take note of Dr. Topol's decision not to continue Chloe's treatment, pointing out that Chloe's "greatest champion," Dr. Topol, had learned in August 2013 that Chloe was lying to him about multiple prescriptions and therefore discharged her. But the trial court did not rely exclusively on the parties' stipulation regarding the discharge from treatment and instead considered all of the trial testimony to find that Chloe had relapsed in 2013. The trial court found evidence of relapse from observations of Chloe's behavior, her symptoms of overmedication, a relapse in her use of benzodiazepines, pill-seeking behavior, and her persistent issues with addiction to prescription medication. The trial court even observed that "[b]eyond Dr. Topol, multiple professionals testified regarding their direct observations of [Chloe's] continued substance use." The trial court noted that OCS had presented evidence of Chloe's overmedication, slurred speech, sleepiness, and late or missed appointments, provided by people who knew her, including Tyska, Weltzin, Dr. Youngblood, and Dr. Destiny Sergeant,[16] who provided evidence of Chloe's continued drug use and its detrimental

___

[16] Dr. Sergeant was Chloe's treating psychologist. Dr. Sergeant did not (continued...)

effect on her ability to safely parent Timothy. The trial court concluded that based on this evidence, Chloe could not take care of Timothy and reunification could not be considered. We therefore conclude that, even without the stipulated testimony, the record supports the trial court's finding that Chloe relapsed, putting Timothy at risk of substantial harm. And in any event, the trial court properly considered the information provided in the stipulation because parties may stipulate to any factual or legal matter, even adjudication and disposition.[17]

We also reject Chloe's argument that she received ineffective assistance of counsel because her attorney decided to enter the stipulation rather than request a hearing to address the statements Dr. Topol made in his affidavit. A parent has a due process right to effective counsel in a termination of parental rights proceeding.[18] When we review the question whether a litigant has raised successfully an ineffective assistance challenge, we apply the two-pronged test established in *Risher v. State*.[19] Under the first prong, the litigant must show that her attorney's performance was below a level that any reasonably competent attorney would provide, bearing in mind that "reasonable tactical

---

[16](...continued)
testify, but her May 31, 2013 report stated that when Chloe arrived for her bi-monthly appointment, she appeared very drowsy and her speech was slurred. Dr. Sergeant attributed this behavior to Chloe's statement that she took Ambien at 3:00 a.m. and then only slept about 30 minutes, despite warnings not to take Ambien that late and without having a full night of sleep.

[17]     *See* CINA Rule 14.

[18]     *S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 61 P.3d 6, 10 (Alaska 2002) (citing *V.F. v. State*, 666 P.2d 42, 47-48 (Alaska 1983)).

[19]     *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 784-86 (Alaska 2012) (quoting *Risher v. State*, 523 P.2d 421, 425 (Alaska 1974)).

decisions are virtually immune from subsequent challenge even if, in hindsight, better approaches could have been taken."[20] Under the second prong, the litigant must demonstrate that counsel's improved performance would have affected the outcome of the case.[21] It is not necessary to address the first prong of the test when the litigant has not satisfied the second prong.[22]

It is hard to fathom how the decision to enter into the stipulation rather than allow Dr. Topol to present live testimony would not have been a reasonable tactic to minimize the impact of the testimony, particularly where the stipulation set out Chloe's denial of any wrongdoing.[23] But we need not address whether Chloe's attorney's decision to stipulate to Dr. Topol's testimony was tactical, because Chloe has failed to demonstrate that an improved performance by her attorney would have made a difference in the outcome of the case. Here, the superior court expressly relied on the other substantial live testimony and evidence presented to demonstrate that Chloe had relapsed.

---

[20] *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 858-59 (Alaska 2013) (citation and internal quotation marks omitted).

[21] *David S.*, 270 P.3d at 784; *see also Chloe O.*, 309 P.3d at 859.

[22] *See Stanley B. v. State, DFYS*, 93 P.3d 403, 408-09 (Alaska 2004) (stating that where a parent argued that his attorney's various failures amounted to a denial of his due process right to effective assistance of counsel at the termination trial, it was not necessary to address the first prong because the parent had not demonstrated how any of the attorney's alleged errors in performance actually harmed him).

[23] Similarly, in *Chloe O.*, we determined that "it [was] probable that [a mother's] attorney made a reasonable tactical choice in deciding not to call [an expert witness] to testify on remand." 309 P.3d at 859.

Finally, we turn to the concurring opinion's concern about our decision to review Chloe's ineffective assistance claim without first providing her with "a fair opportunity to develop a record" for her challenge in the superior court.[24] Effective assistance of counsel in parental rights termination proceedings is a constitutional right.[25] But when ineffective assistance of counsel is alleged, "[t]he knottiest issue presented is the practical application of a post-trial remedy, given the time constraints that apply in a parental termination case because of a child's need for permanency."[26] The two most common approaches to the issue are direct appeal and post-judgment motion to the trial court.[27] As the Hawaii Supreme Court noted not long ago: "A majority of jurisdictions has concluded that direct appeal is the most appropriate method for raising ineffective assistance of counsel in termination proceedings, due to the particular need for expeditious resolution and finality in child custody disputes."[28]

The argument in favor of the direct appeal approach is that it generally is faster and minimizes delay. Delaying custody resolution adversely affects the parties' rights, extends uncertainty in the child's life by leaving the child in the limbo of

---

[24] Concurrence at 26.

[25] *David S.*, 270 P.3d at 784 (citing *In re K.L.J.*, 813 P.2d 276, 283 n.6 (Alaska 1991) (right to counsel); *V.F. v. State*, 666 P.2d 42, 45 (Alaska 1983) (right to effective assistance of counsel)).

[26] *N.J. Div. of Youth & Family Servs. v. B.R.*, 929 A.2d 1034, 1039 (N.J. 2007); *see also In re RGB*, 229 P.3d 1066, 1085 (Haw. 2010) (noting "state courts have struggled to determine the proper procedural vehicle for raising ineffective assistance of counsel in termination of parental rights proceedings").

[27] *See* Susan Calkins, *Ineffective Assistance of Counsel in Parental-Rights Termination Cases:  The Challenge for Appellate Courts*, 6 J. App. Prac. & Process 179, 199-205 (2004).

[28] *In re RGB*, 229 P.3d at 1085 (citations omitted).

impermanent foster care, and increases the possibility of the child suffering permanent harm.[29] The arguments against the direct appeal approach are that the appellate court may not be able to determine the claim's merits from the record and trial counsel still may be representing the parent.[30]

Although it may be preferable to establish a court rule setting out how to raise an ineffective assistance of counsel claim in this context,[31] we have not done so; we instead have resolved claims as presented to us. And we have decided claims on direct appeal when the issue was not raised in the trial court, despite the parent asking for a remand for the trial court to consider the matter, implicitly recognizing that we would remand for an evidentiary hearing if it were appropriate.[32] For example, we recently concluded in *Chloe O. v. State, Department of Health & Social Services, Office of Children's Services* that it was unnecessary to remand the case to the trial court for consideration of a parent's ineffective-assistance allegations.[33] We recognized that such

---

[29]     Calkins, *supra* note 27, at 207, 235.

[30]     *Id.* at 209-10.

[31]     *See id.* at 212 (suggesting court rule so parties know appropriate procedure in advance).

[32]     *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 852, 858-59 (Alaska 2013) (rejecting remand request because (1) it would contravene child in need of aid statutes' emphasis on expeditious resolution and (2) parent's proposed claim clearly had no merit under test for ineffective assistance of counsel); *see also Julia D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1467, 2013 WL 5314609, at *4-5 (Alaska Sept. 18, 2013) (holding parent's ineffective assistance claim had no merit); *Stanley B. v. State, DFYS*, 93 P.3d 403, 408-09 (Alaska 2004) (same).

[33]     309 P.3d at 858.

a remand "would result in a significant additional delay in . . . attaining permanency."[34] Through its statutory scheme for child protection, the legislature has "ma[d]e clear that children's proceedings are to be expeditiously resolved."[35] And "[a] remand for potentially lengthy litigation of a claim of ineffective assistance of counsel would contravene the language and spirit of these statutes."[36] Thus in *Chloe O.*, we directly examined the claim of ineffective assistance of counsel and determined that the parent's challenge did not pass either prong of the *Risher* test.[37] We adopted the same approach when we reviewed the ineffective assistance claims raised in *Stanley B.*[38] and *Julia D.*[39]

We have also consolidated a parent's concurrent appeals of both a termination judgment and a later decision denying a post-judgment claim for ineffective assistance under Alaska Civil Rule 60(b)(6), issuing a single decision.[40] And we have decided claims on direct appeal when the parent unsuccessfully attempted to replace counsel during the trial court proceedings on the ground of ineffective assistance of

---

[34]    *Id.*

[35]    *Id.*

[36]    *Id.*

[37]    *See id.* at 858-59.

[38]    93 P.3d 403, 408-09 (Alaska 2004).

[39]    Mem. Op. & J. No. 1467, 2013 WL 5314609, at *4-5 (Alaska Sept. 18, 2013).

[40]    *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 774, 784-86 (Alaska 2012); s*ee also Dan A. v. State, Dep't of Health & Human Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1404, 2012 WL 104482, at *6-7 (Alaska Jan. 13, 2012) (resolving both merits appeal and ineffective assistance of counsel claim after staying case at trial court's request for limited remand on parent's Alaska R. Civ. P. Rule 60(b)(6) motion).

counsel.[41]  In a recent case where the parent unsuccessfully attempted to replace counsel during the trial court proceedings and later on direct appeal claimed ineffective assistance of counsel, we recast the issue as an appeal of the trial court's alleged failure to recognize and resolve an ineffective assistance of counsel claim and resolved it with a plain error analysis.[42]

In this case, Chloe W. chose to raise her ineffective assistance claim in a direct appeal of the termination of her parental rights.  She has new counsel on appeal who had an opportunity to evaluate the ineffective assistance of counsel claim and how it might best be presented.  She raised the claim on direct appeal but failed to substantiate it based on the record before us.  Even if we accept Chloe's representations regarding her trial lawyer's shortcomings in entering the stipulation regarding Dr. Topol's testimony, Chloe did not "demonstrate that 'an improved . . . performance would have made a difference in the outcome of [the] case.' "[43]

B.      **The Trial Court Did Not Err In Finding That Chloe Failed To Remedy The Conduct That Placed Timothy At Substantial Risk of Harm.**

Chloe argues that the trial court erred in finding that she failed to remedy the conduct that placed Timothy at risk.  She claims that the evidence does not support the trial court's conclusion that she had relapsed, because the accusations of her slurred speech and lethargy could be explained as a combination of dentures and accidental

---

[41]      *S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 61 P.3d 6, 15-16 (Alaska 2002); *P.M. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1127, 1131-32 (Alaska 2002).

[42]      *Grace L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 329 P.3d 980, 988-89 (Alaska 2014).

[43]      *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 859 (Alaska 2013) (quoting *David S.*, 270 P.3d at 786).

misuse of prescribed Ambien. We conclude that substantial evidence supports the trial court's finding that Chloe failed to remedy the conditions that put Timothy at risk, based on the evidence presented of Chloe's history of misusing medication, relapse, continuing mental conditions, and resistance to treatment and other help.

Alaska Statute 47.10.088(a)(2) requires that before terminating parental rights, a trial court must find by clear and convincing evidence that a parent has not remedied in a timely fashion the conduct or conditions in the home that place the child at substantial risk of harm.[44] In making this determination, the court may take into account any fact relating to the best interests of the child.[45] Whether a parent failed to remedy conduct or conditions that placed the child at substantial risk of harm is a factual finding.[46] Findings of continued substance abuse and refusal to undergo treatment are sufficient to satisfy failure to remedy.[47] "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[48]

Based on the reports and supporting testimony, the trial court found that Chloe failed to remedy the conduct or conditions that endangered Timothy. She had not resolved her substance abuse or addressed her underlying mental health needs, and she

---

[44]     *See also* CINA Rule 18(c)(1)(A).

[45]     AS 47.10.088(b).

[46]     *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011) (citation omitted).

[47]     *See, e.g.*, *Stanley B. v. State, DFYS*, 93 P.3d 403, 407 (Alaska 2004).

[48]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

was still unable to provide basic care for Timothy. The trial court referred specifically to the testimony of social workers and mental health professionals who had direct contact with Chloe, including Dr. Youngblood, Tyska, and Dr. Sergeant, who were concerned about Chloe's recent slurred speech, sleepiness, and missed appointments, indicating her misuse of pharmacological substances. The trial court expressed particular concern that Chloe's inability to control her medication use remained virtually unchanged since 2010. The trial court also found that Chloe remained untreated for underlying trauma, which continued to have significant impact on her mental health, and three years later she still had not progressed beyond supervised or monitored visits with Timothy. Based on the evidence presented at both trials, the trial court found that Chloe's personality disorder was likely to affect her parenting so that she could not put Timothy's needs ahead of her own. Because the record supports the trial court's finding that Chloe had not remedied the conduct or conditions that placed Timothy at risk of harm, we affirm the finding.

## C. The Trial Court Did Not Err In Finding That OCS Made Active Efforts To Prevent The Breakup Of The Indian Family.

Chloe argues that the trial court erred in finding that OCS made active efforts to prevent the breakup of this Indian family because OCS did not provide Chloe a parenting plan that would work for her and OCS would not allow her to have Timothy in her home to demonstrate her ability to parent Timothy full time. We disagree.

Before terminating parental rights to an Indian child, a superior court must find by clear and convincing evidence that OCS made active but unsuccessful efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family.[49] Courts review OCS's reunification efforts on a case-by-case basis

---

[49] 25 U.S.C. § 1912(d) (2012); CINA Rule 18(c)(2); *see also Christopher C. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 303 P.3d 465, 476

(continued...)

because "no pat formula exists for distinguishing between active and passive efforts."[50] Generally, active efforts entail a social worker taking a parent through the steps of a reunification case plan, rather than simply devising a plan and requiring the parent to develop her own resources.[51] In evaluating whether OCS met its active efforts burden, a court may consider a parent's demonstrated lack of willingness to participate in treatment[52] and look to the state's involvement in its entirety.[53]

Here, the trial court found by clear and convincing evidence that OCS had met its active efforts burden, noting "remarkable," "extraordinary," and "amazing" efforts on the part of OCS, the Tribe, Southeast Alaska Regional Health Consortium, and Chloe's attorneys, to get Chloe's attention focused on reunification. The trial court pointed to numerous examples, including Graham's tremendous hands-on involvement and her special efforts to develop a working relationship with Chloe to help her succeed in parenting. Graham gave Chloe her personal cell phone number, took Chloe to lunch, and facilitated family gatherings, often on Graham's own time. Graham dug into her own pocket to purchase and deliver cleaning supplies for Chloe, and she transported Chloe herself, provided bus passes, and arranged for other transportation. She even took care of Chloe's dog while Chloe was away from home.

---

[49](...continued) (Alaska 2013).

[50]     *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting *A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997)) (internal quotation marks omitted).

[51]     *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1114 (Alaska 2010) (citations omitted).

[52]     *Id.*

[53]     *Maisy W.*, 175 P.3d at 1268.

Following the trial court's December 2012 order, OCS participated in monthly status hearings held by the court.[54]  There were also weekly case-planning meetings, mediation, and coordination between OCS, Catholic Community Services, and the Tribe to remove all obstacles to Chloe's reunification with Timothy, and regular communication with Chloe regarding her case plan.  Graham also requested active assistance from OCS mental health clinician Weltzin, to be sure OCS was providing adequate resources for Chloe.  Additional examples of OCS's efforts include counseling, other therapy, and financial assistance.  OCS social workers met regularly to brainstorm different approaches that might work with Chloe, but Chloe chose not to attend these meetings.  OCS placed Timothy with Chloe's immediate family, transported him to and from visits, and arranged assessments of his development.  Martin Tyska from Catholic Community Services spent almost 70 hours working with Chloe on parenting and cooking, and they even went together to buy diapers.  Timothy's Guardian Ad Litem, Debra Schorr, testified that OCS made "tremendous efforts" toward progress, despite Chloe's limited cooperation.

Because of the undeniably excellent efforts OCS made to prevent the breakup of this family, we affirm the trial court's finding.

### D.     The Trial Court Did Not Err In Finding That Returning Timothy To Chloe Likely Would Result In Serious Harm.

Chloe argues that the trial court erred in finding that returning Timothy to her likely would result in serious harm to Timothy.  She claims that the trial court improperly based its decision upon the testimony of witnesses who paid no attention to

---

[54]     We also commend the trial court on its thoughtful approach to this case and its own efforts, scheduling frequent hearings to monitor Chloe's progress, providing encouragement to Chloe, and giving her every opportunity to succeed.

Chloe's Tlingit heritage.  Chloe maintains that she has demonstrated an ability to care for Timothy and has never hurt him.  Chloe's arguments lack merit.

Before terminating parental rights, ICWA requires that the trial court find "beyond a reasonable doubt, based on evidence that includes testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[55]  This finding requires proof that "the parent's conduct is likely to harm the child, and proof that it is unlikely the parent will change her conduct."[56]  These two elements can be proved through the testimony of a single expert witness or by a combination of expert and lay witnesses.[57]  Whether expert testimony in a CINA case satisfies ICWA requirements is a pure legal question reviewed de novo.[58]  Serious harm "can be proved through the testimony of a single expert witness, by aggregating the testimony of expert witnesses, or by aggregating the testimony of expert and lay witnesses."[59]

Finding beyond a reasonable doubt that Timothy was likely to suffer emotional or physical damage if Chloe's rights were not terminated, the trial court focused on the three-year relationship (since birth) developed between Timothy and his foster parents and the harm that would come if custody were moved to Chloe.  The court

---

[55]     *Lucy J.*, 244 P.3d at 1117 (quoting *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 503 (Alaska 2009)).

[56]     *Id.* (citation and internal quotation marks omitted).

[57]     *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000) (citations omitted).

[58]     *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002).

[59]     *L.G.*, 14 P.3d at 950 (citations omitted).

predicted that based upon the evidence presented at trial, if termination were not granted, Timothy would continue in foster care for several years without resolution and would experience harm stemming from lack of permanence in his life. The trial court's finding was based on the testimony of numerous witnesses, including Graham and qualified ICWA experts Dr. Youngblood[60] and Jeannie Arledge.[61] Dr. Youngblood's reports stated that when intoxicated, Chloe was unable to put Timothy's basic needs ahead of her own, even his basic needs for food and safety. Arledge testified that Chloe's mental health issues would make her emotionally unavailable to Timothy, and her substance abuse issues would put him at risk of harm.

The record also contains evidence that the trial court invited input from the Tribe to address any issues that might be particular to Chloe's Alaska Native heritage, and the Tribe expressed concerns about Chloe's failure to take the opportunity to provide OCS with proof of sobriety by urinalysis or the substance abuse assessment done at Rainforest Recovery Center. The Tribe considered tradition and culture and noted that it was in Timothy's best interests to continue living in his current home with the only family he has ever known. Despite its noted grief and sadness at recommending termination of Chloe's parental rights to Timothy, the Tribe recognized that there is "a

---

[60]     Dr. Youngblood testified that at the time of trial, she had been practicing for seven years in Ketchikan and had previously been qualified as an expert in psychological evaluations. The trial court qualified her as an expert in clinical psychology.

[61]     Arledge is regional staff manager for OCS for the southeast region, with a bachelor's degree in psychology and a master's degree in social work, and 14 years experience with OCS. Arledge testified that she had previously been qualified as an expert in the areas of child protection and permanency. She started receiving ICWA training in 1999 and approximately 80 percent of her cases involve ICWA.

loving, supportive extended family member that is available and eager to be [Timothy's] life long placement."

We conclude that, based on Chloe's untreated substance abuse and underlying emotional issues, as well as Timothy's option for permanency with the family he has lived with since birth, the trial court did not err in finding beyond a reasonable doubt that allowing Chloe custody of Timothy likely would result in serious emotional or physical damage to Timothy. We therefore affirm the trial court's findings.

### E. The Trial Court Did Not Err In Finding That Termination Of Chloe's Parental Rights Was In Timothy's Best Interests.

Chloe argues that the trial court erred in finding that termination of her parental rights was in Timothy's best interests because the trial court did not consider the existing bond between her and Timothy or her consistent demonstration of desire to care for her son. We disagree.

Before terminating parental rights to a child, the superior court must find by a preponderance of the evidence that termination is in the child's best interests.[62] The court may consider the statutory factors listed in AS 47.10.088(b) in determining whether termination of parental rights is in the best interests of the child, including:

> (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
> (2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
> (3) the harm caused to the child;
> (4) the likelihood that the harmful conduct will continue; and
> (5) the history of conduct by or conditions created by the parent.[63]

---

[62] CINA Rule 18(c)(3); *see also* AS 47.10.088(c).

[63] AS 47.10.088(b).

The superior court may also consider any other facts relating to the best interests of the child and need not accord a particular weight to any given factor.[64] The superior court may consider the bonding that has occurred between the child and his foster parents,[65] the need for permanency,[66] and the offending parent's lack of progress.[67] The superior court is not required to consider or give particular weight to any specific factor, including a parent's desire to parent or her love for the child.[68]

Recognizing the importance of permanency and considering Timothy's healthy relationship with the Campbells, the trial court found that OCS had established by a preponderance of evidence "quite convincingly" that termination of Chloe's parental rights to Timothy was in his best interests. Despite OCS's and the trial court's clear expectations and regular monitoring of the situation, Chloe showed little change in

[64] *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 932 (Alaska 2012) (citations omitted).

[65] *See Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 853 (Alaska 2014); *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 261 (Alaska 2013).

[66] *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 968 (Alaska 2013).

[67] *See Phoebe S. v. State, Dep't of Health & Soc. Servs., Office of Children's Services*, Mem. Op. & J. No. 1495, 2014 WL 1691614, at *7 (Alaska Apr. 23, 2014).

[68] *See, e.g., Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1263-64 (Alaska 2010) (despite testimony that mother and children bonded during their regular and positive visits, and that termination of bond would be traumatic to the children, trial court did not err in determining that termination of parental rights was in children's best interests based on their need for permanency, stability they enjoyed in their foster home, and the fact that neither biological parent would be ready to care for the children on a full-time basis within a reasonable period of time).

her life, particularly between the first termination trial in 2010 and the second trial, three years later. Several witnesses with direct knowledge of Timothy's current placement and Chloe's abilities, including Graham, Schorr, and Arledge, testified that Timothy needed permanency and that, because of Chloe's history and the option for Timothy to continue living with the Campbells, reunification would not be in Timothy's best interests. In light of the trial court's discretion in determining which factors to consider in its best interests analysis, we conclude that the court properly took into account factors such as Timothy's need for permanency, his bond with the Campbells, and the likelihood that Chloe would not be ready to provide full-time care for Timothy within a reasonable period of time. We therefore affirm the trial court's best interests finding.

V.    CONCLUSION

We AFFIRM the trial court's decision in all respects.

BOLGER, Justice, concurring.

I agree with the majority of the court's opinion. But I disagree with the decision to review Chloe's claim of ineffective assistance of counsel. Chloe did not raise this claim in the trial court, so we have no superior court order to review directly. And the record contains no explanation of her attorney's decision that would assist our review.[1] We generally decline to consider a claim that is raised for the first time on appeal.[2]

The court's opinion notes there is no record support for Chloe's claim of ineffective assistance and apparently concludes that the record shows, beyond a reasonable doubt, that her counsel's incompetence did not contribute to the outcome of this case.[3] However, it is unlikely the trial court record will contain the evidence of the impact of her attorney's decisions when Chloe was represented in the trial court by the same counsel whose conduct she challenges on appeal. In my opinion, we should avoid direct review of this issue unless the appellant has had a fair opportunity to develop a record.

---

[1]     *See Nelson v. State*, 273 P.3d 608, 612 (Alaska 2012) (requiring a challenging party to present "some evidence ruling out the possibility of a tactical reason explaining" an attorney's conduct).

[2]     *See Grace L. v. State, Dep't of Health & Soc. Servs.*, 329 P.3d 980, 989 (Alaska 2014) (citing *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 384 (Alaska 2007)) (declining to review an ineffective assistance of counsel claim that was not raised in the superior court).

[3]     *See David S. v. State, Dep't of Health & Social Servs.*, 270 P.3d 767, 784 (Alaska 2012) (adopting the two-pronged test for ineffective assistance of counsel from *Risher v. State*, 523 P.2d 421, 425 (Alaska 1974)).

Many state courts simply decline to address an ineffective assistance of counsel claim in termination cases unless the claim has been raised in the trial court.[4]  In *Wetherhorn v. Alaska Psychiatric Institute*, in the context of a civil commitment proceeding, we discussed the reasons for declining direct review under these circumstances:

> [I]t is difficult for an appellate court to review a claim of ineffective assistance of counsel unless a record has been developed that includes findings of facts and conclusions of law regarding the claim.  Therefore, in *Barry v. State*, the court of appeals "require[d] that the question of ineffective assistance of counsel be argued first to the trial judge either in a motion for a new trial or an application for post-conviction relief."  In this case, we cannot review a claim for ineffective assistance of counsel without an explanation in the record for counsel's actions; otherwise we become engaged "in the perilous process of second-guessing."  Because in this case no record has been developed, we do not review the issues.  We therefore require respondents to establish a record concerning counsel's challenged acts or omissions by applying to the trial court to seek a new commitment and medication hearing by a motion for relief under Alaska Civil Rule 60(b) or by a Civil Rule 86 habeas corpus petition.[5]

---

**4**      *See, e.g.*, *K.H. v. Jefferson Cnty. Dep't of Human Res.*, 106 So. 3d 420, 423 (Ala. Civ. App. 2012) ; *Porta v. Arkansas Dep't of Human Servs.*, 431 S.W.3d 383, 387 (Ark. App. 2014); *In re Marriage of Stephen P.*, 153 Cal. Rptr. 3d 154, 161 (Cal. App. 2013); *L.H. v. Dep't of Children & Families*, 995 So. 2d 583, 584-85 (Fla. Dist. App. 2008); *In re S.D.*, 671 N.W.2d 522, 530 (Iowa App. 2003); *In re S.P.*, 76 A.3d 390, 394 n.4 (Me. 2013); *In re Oleg*, 776 N.E.2d 1039 (Mass. App. 2002); *Matter of the Welfare of J.M.K.A., Child*, No. Co-97-1156, 1997 WL 770399, at \*3 (Minn. App. Dec. 16, 1997); *Matter of C.C.*, 907 P.2d 241, 244-45 (Okla. Civ. App. 1995); *Interest of M.D.(S).*, 485 N.W.2d 52, 55-56 (Wis. 1992).

**5**      *Wetherhorn*, 156 P.3d at 384 (footnotes and citations omitted).

I believe we should continue to follow this reasoning unless there is a compelling reason not to do so.

As the *Wetherhorn* court noted, the Alaska Court of Appeals addressed this issue many years ago in *Barry v. State*.[6] In *Barry*, the court noticed "an increasing number of direct appeals raising the issue of ineffective assistance of counsel on inadequate records."[7] The court noted that in these cases "[t]he issue was not presented to the trial court, and findings of fact and conclusions of law were not adopted" regarding the defendants' claims.[8] The court concluded that such claims could not "be effectively reviewed for the first time on appeal."[9]

We are facing the same situation. As the court's opinion notes, we have reviewed numerous appeals in parental rights termination cases where the record is simply inadequate to make out a case of ineffective assistance of counsel. There is no reason to believe a litigant would be able to make an adequate record when represented by the same counsel whose effectiveness is at issue. I believe we should simply decline direct review of these claims.

---

[6]    675 P.2d 1292, 1295 (Alaska App. 1984).

[7]    *Id.*

[8]    *Id.*

[9]    *Id.*