NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| EMILY S., | ) | |
| | ) | Supreme Court No. S-16518 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-14-00089 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, | ) | AND JUDGMENT* |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE | ) | No. 1645 – August 2, 2017 |
| OF CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael P. McConahy, Judge.

Appearances: J. Adam Bartlett, Anchorage, for Appellant. Aisha Tinker Bray, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee. Carol L. Jacoby, Assistant Public Advocate, Fairbanks, and Richard Allen, Public Advocate, Anchorage, Guardian Ad Litem.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

---

\* Entered under Alaska Appellate Rule 214.

# I. INTRODUCTION

The superior court terminated a mother's parental rights, and she appeals. She argues that the superior court erred in three of its findings: (1) that she failed to remedy the conduct that endangered her child; (2) that the Office of Children's Services (OCS) made reasonable efforts to reunify the family; and (3) that termination of her parental rights was in the child's best interests. Because the superior court's fact findings are not clearly erroneous, and because the court did not err in concluding that OCS made reasonable efforts to reunify the family, we affirm.

# II. FACTS AND PROCEEDINGS

Evan was born in August 2010, the son of Emily S. and a man who had no significant involvement in Evan's life and did not participate in these proceedings.[1] This case primarily concerns Evan's relationship with Emily's domestic partner, Julio. Emily began living with Julio in 2012, and he eventually became a father figure to Evan.

In July 2014 OCS received a report that Evan was afraid to go home; he had told a police officer that Julio hit him with a hammer and a belt. Emily denied all allegations of abuse, but she agreed to enter into a protective plan with OCS under which she would leave Evan with his maternal grandmother, Kim, for seven days.

But two days after Emily signed the protective plan, she and Julio went to Kim's house to take Evan away. Kim was on the phone with an OCS caseworker, Kelly Anderson, when they arrived. Anderson testified that "the phone . . . dropp[ed]" in "the midst of a sentence" and she could hear "adults yelling and cursing" and Evan "screaming in the background." The phone was disconnected and Anderson could not reconnect the call. She called 911, and the Alaska State Troopers responded. They

---

[1] Pseudonyms are used for all family members.

eventually found Emily and Julio and took them to a police station, where Emily revealed Evan's location. OCS then took Evan into emergency custody.

OCS placed Evan with Kim and created case plans for Emily and Julio. In October 2014 Emily began a "limited family reunification program" which included, among other things, parenting classes and supervised visitation with Evan. She also completed a parental risk assessment, but she responded defensively to many questions, largely invalidating the results. She began individual therapy in July 2015, but a year later she had not made enough progress to retake the parental risk assessment. Still, near the time of trial her OCS caseworker testified by deposition that Emily had "completed [the] services" recommended by her case plan, though the caseworker qualified this by saying that the parents' "logged hours" had not translated into "behavioral changes to indicate that [Evan] would be at all safe" if returned home.

OCS offered services to Julio as well because of his live-in relationship with Emily. He completed a parental risk assessment in February 2015, began weekly individual counseling the following September, and completed a behavioral risk assessment in November. The behavioral risk assessment placed him in the highest category of risk for re-offense of domestic violence and physical assault within five years, and his clinician noted "a lot of [additional] risk factors," including a "history of domestic violence," allegations of child abuse, a "high level of denial," and "mental health issues."

Meanwhile, Evan began individual counseling with Sean O'Neil at Borealis Counseling and Assessment. O'Neil diagnosed Evan with post-traumatic stress disorder (PTSD) and identified Julio as the source of Evan's trauma. He observed that Evan was terrified of Julio and would soil himself out of fear that Julio was "coming to get [him]." O'Neil testified at trial that Evan was "living a nightmare . . . day to day" and that "any

contact or mention of contact with [Julio] . . . , any comment about [Julio] triggered [Evan]." O'Neil concluded that Evan should not have any contact with Julio or return to Emily as long as she and Julio continued their relationship.

Emily had concerns about O'Neil's objectivity, suspecting that he was overly influenced by what he was told by her mother, Kim. She asked for a second opinion, and OCS responded by retaining Jennifer Hood, a licensed professional counselor, for an independent evaluation. Hood reached many of the same conclusions as O'Neil. She confirmed the diagnosis of PTSD and identified Julio as the source. She reported the same fearful behaviors and noted that Evan referred to Julio as a "monster." And she concluded that because of Evan's "extreme fear and negativity," he would be "revictimiz[ed]" by any contact with Julio. She therefore recommended that there be no contact. While Hood did not "see anything wrong" with continuing visitation with Emily, she stressed that "there would have to be a third party [Evan] feels safe with to allow the contacts to continue."

OCS briefly permitted Evan to visit other family members, but Emily soon began dropping in on visits, and on some occasions she brought Julio along. Around the same time Evan "regressed considerably." Emily, meanwhile, did not accept responsibility for losing custody of Evan and continued to deny the allegations of abuse. Emily's OCS caseworker testified that "[Emily] does not believe that [Evan] was beaten. She does not believe that his PTSD stems from a legitimate cause. She does not believe that [Julio] is unsafe for [Evan]. And so she hasn't made the behavioral changes." Although Emily's therapist testified that Emily "understood" Evan's "reality" and "the reality that he's scared of [Julio]," she acknowledged that Emily did not "believe the allegations" that underlay his fear.

OCS filed a petition to terminate Emily's parental rights. Following trial in June 2016 the superior court concluded that Evan was a child in need of aid based on physical harm, mental injury, and neglect. It found by clear and convincing evidence that Emily had not remedied the conduct that caused Evan to be in need of aid; specifically, it found that Emily could not keep Julio away from Evan. The court determined that OCS had made reasonable efforts to reunite the family. Finally, the court found by a preponderance of the evidence that termination was in Evan's best interests.

Emily appeals.

## III.  STANDARDS OF REVIEW

We review a trial court's findings of fact for clear error.[2] "[W]hether a parent has remedied the conditions that placed the child in need of aid . . . and whether termination is in a child's best interests are factual determinations."[3] "Findings are clearly erroneous if," after a full review of the record, "we are left with a definite and firm conviction that a mistake has been made."[4]

---

[2]     *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 774 (Alaska 2012) (citing *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002)) .

[3]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 948-49 (Alaska 2013) (first citing *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103-04 (Alaska 2011); then citing *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 962 (Alaska 2013)).

[4]     *Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 348 (Alaska 2016) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

Whether OCS made reasonable efforts to "prevent out-of-home placement or enable the child's safe return to the family home" is a mixed question of fact and law.[5] For mixed questions of fact and law, "we review factual questions under the clearly erroneous standard and legal questions using our independent judgment."[6]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err In Finding That Emily Did Not Remedy The Conduct Or Conditions That Endangered Evan.

In order to terminate parental rights the superior court must find "by clear and convincing evidence" that the parent "has not remedied the conduct or conditions in the home that place the child at substantial risk of harm."[7] "Compliance with treatment plans does not guarantee that parental rights will not be terminated because it cannot guarantee that adequate parenting skills will be acquired from the treatment regimen."[8] For instance, we have affirmed the termination of a mother's parental rights — even though she "formally complied with her case plan" — because she did not

---

[5] *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432 (Alaska 2015) (first citing AS 47.10.086(a); then citing *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014)).

[6] *Joy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 382 P.3d 1154, 1162 (Alaska 2016) (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 332 P.3d 1268, 1274 (Alaska 2014)).

[7] AS 47.10.088(a).

[8] *V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198, 1208 (Alaska 2002) (citing *In re T.W.R.*, 887 P.2d 941, 945 (Alaska 1994)).

"internalize[] what she ha[d] learned and there [was] no real assurance" that she could safely parent her child.[9]

Emily argues that the superior court erred in this case because she (1) completed her case plan, (2) demonstrated that she was willing to keep Evan away from Julio, and (3) was willing to acknowledge that Evan believed his allegations of abuse, even though she did not. The question the superior court had to answer was not whether Emily had completed her case plan, but whether she had recognized and addressed the conditions and behaviors that endangered her child;[10] the court found she had not. The court aptly distinguished between the case plan's goals and the services intended to promote those goals. It observed that "[t]he goals in the case plan are behavior changes that are supported by services. [Emily] has been engaging in those services and individual counseling but she hasn't made the behavior changes the case plan is asking for." In our view, it was not clear error to find that Emily's conduct belied her testimony; she did not demonstrate that she recognized or understood the nature of the harm Evan had suffered, nor did she show that she could prevent future harm by keeping Julio away from Evan.

The superior court heard evidence about Julio's psychological assessments and his elevated risk of committing domestic violence and physical assault. Julio's latest assessment stated "there would be no reason to expect" that Evan "would be safe and would not be beaten" if he returned to a home with Julio in it, and Evan's therapists saw danger as well; O'Neil testified that if Evan returned to live with Emily, where he would

---

[9] *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1260 (Alaska 2010) (second and third alterations in original).

[10] *V.S.B.*, 45 P.3d at 1208 (citing *In re T.W.R.*, 887 P.2d at 945).

likely come into contact with Julio again, he would "serious[ly] regress[,] . . . undoing . . . much of [Evan's] positive work" during two years of counseling.

The superior court also heard evidence to support a conclusion that Emily would be unable or unwilling to adequately counter this risk of harm. At the case's outset she had joined Julio in their forcible removal of Evan from Kim's house, disregarding an OCS protective plan and precipitating a violent confrontation in front of Evan. She did not prevent Julio from appearing at one of her supervised therapeutic visits with Evan and at a visit with Evan's other family members. On three separate occasions during the termination trial Emily and her younger son met Julio in violation of the terms of a protective plan. The evidence showed that Emily had difficulty living apart from Julio; their one attempt at separation did not last more than a few months, and both Emily and Julio testified that they intended to continue a long-term if not "permanent" relationship.

Emily's behavior before and during the superior court proceedings supported a finding that she did not recognize the risk of harm that Julio posed to Evan's mental and physical well-being. The superior court did not clearly err in finding that Emily failed to remedy the conduct and conditions that placed Evan at risk of harm.

### B. OCS Made Reasonable Efforts To Reunify The Family.

OCS fulfills its statutory duty to make reasonable reunification efforts when it (1) "identif[ies] family support services" to "assist the parent . . . in remedying the conduct or conditions" that endanger the child; (2) "actively offer[s]" and "refer[s]" the parent to these services; and (3) documents its actions.[11] These efforts must be "timely"

---

[11]     AS 47.10.086(a).

and "designed to prevent out-of-home placement."[12]  As with the issue of whether the parent has remedied her conduct, "the primary consideration is the child's best interests."[13]  And while OCS's efforts must be "reasonable," they "need not be perfect."[14]

The superior court, in its oral decision on termination, listed the services OCS offered to Emily and Julio.  These included "substance abuse assessment and treatment," "mental health assessment and counseling," "anger management[] assessment and classes," "random drug testing," "domestic violence counseling and classes," a "parental risk assessment," "parenting education," and "transportation assistance." Emily acknowledges that OCS offered these services and that both she and Julio participated, but she argues that OCS "refused to do the one thing that would have brought this family together":  "trial home visits [and] family counseling."

The superior court, however, agreed with Evan's therapists that Emily's continuing attachment to Julio made any attempt at family counseling problematic.  Both O'Neil and Hood testified that Evan would find any contact with Julio severely traumatizing.  In Hood's opinion "it was best not to go forward with . . . family therapy or any contact" between Julio and Evan.  She added that "once OCS is out of the picture, there would have to be a third party that [Evan] feels safe with" in order to continue visits with Emily.  O'Neil stated that "with [Julio] still . . . present in [Emily's] life," family therapy was not going to work; "[Julio] needed to figure things out and . . . get healthier . . . or [Emily] needed to leave him."

---

[12]  *Jeff A.C., Jr. v. State*, 117 P.3d 697, 705-06 (Alaska 2005) (quoting AS 47.10.086(a)).

[13]  *Id.* (emphasis omitted) (quoting AS 47.10.086(f)).

[14]  *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 678 (Alaska 2008) (citing *Jeff A.C., Jr.*, 117 P.3d at 706).

Both therapists agreed that before family therapy or home visits could begin, Emily had to put her relationship with Evan before her relationship with Julio and ensure that Evan never came into contact with Julio. Emily did not succeed in doing so during the roughly two years leading up to the termination trial, and her three violations of a protective plan for her other child during the trial itself cast doubt on her ability to do so in the future.

We therefore cannot fault the superior court's conclusion that it was reasonable for OCS not to offer trial home visits or family therapy. The court heard credible testimony that the risk of exposure to Julio remained too high for Evan's well-being. And even if OCS's failure to offer these particular services were to constitute a shortcoming in its reunification efforts, it would not render those efforts unreasonable, as they need not be perfect.[15]

## C. The Superior Court Did Not Clearly Err In Finding That Termination Was In Evan's Best Interests.

In order to terminate parental rights, OCS must prove by a preponderance of the evidence that termination is in the child's best interests.[16] The parent-child bond is not the only factor relevant to a best interests determination, and other factors may take precedence depending on the circumstances of the case. For example, the superior court may consider "the bonding that has occurred between the child and his foster parents, the need for permanency, and the offending parent's lack of progress."[17] The court "is not

---

[15]     *Id.* (citing *Jeff A.C., Jr.*, 117 P.3d at 706).

[16]     AS 47.10.088(c); CINA Rule 18(c)(3).

[17]     *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1271 (Alaska 2014) (first citing *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 853 (Alaska 2014); *Amy*
(continued...)

required to consider or give particular weight to any specific factor, including a parent's desire to parent or her love for the child."[18]

The superior court found that termination was in Evan's best interests for several reasons. It determined that Evan was "in a very difficult spot," that he was "fragil[e]," and that he had "significant emotional and mental health needs." The court found that Emily had not "demonstrated the ability to dissociate herself from [Julio]" or provide a "stable, safe environment" for Evan. And the court found that Evan's maternal grandmother, Kim, had met Evan's needs and provided "a place of safety."

Emily argues that the court gave insufficient weight to the parent-child bond, but we conclude that the court's findings were not clearly erroneous. The evidence suggested that Emily, despite her genuine love for Evan, was unable to separate from Julio or recognize the extent of Evan's problems. Emily never demonstrated that she could put Evan's needs above her own desire to be with Julio, and Evan did not trust Emily to keep him safe.

In contrast, Kim provided Evan with safety and stability. O'Neil, Evan's primary counselor, testified that he had "never seen a negative reaction from [Evan] to [Kim] or [from Kim] to [Evan]." He described Kim as Evan's "safety net" and "Rock of Gibraltar." And he opined that if Evan were removed from Kim he "would regress significantly."

---

[17]    (...continued)
*M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 261 (Alaska 2013); then citing *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 968 (Alaska 2013); and then citing *Phoebe S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-15112, 2014 WL 1691614, at *7 (Alaska Apr. 23, 2014)).

[18]    *Id.* (citing *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1263-64 (Alaska 2010)).

The superior court did not clearly err when it found that termination was in Evan's best interests.

## V.    CONCLUSION

We AFFIRM the termination of Emily's parental rights.