NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JORDAN J., | ) | |
| | ) | Supreme Court No. S-15631 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-11-00183/ |
| v. | ) | 00184 CN |
| | ) | |
| STATE OF ALASKA, | ) | MEMORANDUM OPINION |
| DEPARTMENT OF HEALTH & | ) | AND JUDGMENT[*] |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | No. 1538 – April 29, 2015 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Paul E. Olson, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Janell M. Hafner, Assistant Attorney General, and Craig T. Richards, Attorney General, Juneau, for Appellee. Marika R. Athens, Assistant Public Advocate, and Richard K. Allen, Public Advocate, Anchorage, for Guardian ad Litem.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

## I.    INTRODUCTION

A mother appeals termination of parental rights to her children on the grounds that the trial court erred by finding that: (1) she failed to timely remedy the conduct that placed the children at risk, even though she was complying with her case

---

[*]    Entered under Alaska Appellate Rule 214.

plan and had divorced her husband, a registered sex offender; (2) the Office of Children's Services (OCS) made reasonable efforts toward reunification; and (3) terminating her parental rights was in the children's best interests. The mother further contends that she received ineffective assistance of counsel because her attorney provided testimony from only one witness and did not present closing argument. We affirm the trial court's decision.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Jordan[1] has six children by four different fathers; her youngest child was born in 2012, several years after OCS became involved with Jordan's family.[2] Jordan appeals termination of her parental rights to her two oldest children: Danny, born in 2002,[3] and Nick, born in 2004.[4]

Between 2005 and 2014 OCS received more than 20 reports of harm regarding Jordan's children, several of which were substantiated. OCS took custody of four of her children in May 2011, in part because Jordan was leaving them unsupervised with Stanley, a registered sex offender whom she had married. OCS took custody of Jordan's youngest child in 2012, a few months after birth. In 2013, after reunification

---

[1]    We use pseudonyms to protect the family's privacy.

[2]    One child, Cooper, lives with his father and is not involved in this case. Before trial, Jordan relinquished her parental rights to three children: Carl, born in 2009; Adam, born in 2010; and Alanna, born in 2012.

[3]    Danny's father has relinquished his parental rights.

[4]    The trial court terminated Nick's father's parental rights based on an unopposed offer of proof.

efforts failed, OCS sought to terminate the parental rights of all the parents of the five children in its custody.[5]

Before OCS assumed custody of the children, it had contact with Jordan because of previous reports of harm and Stanley's presence in her household. OCS created a safety plan providing that the children could not be left unsupervised with Stanley. OCS removed the children after Jordan failed to comply with the safety plan. When OCS took custody of the children, Danny at age nine and Nick at age six were having to supervise, bathe, clothe, and feed the younger children, who were two and less than one year old. Danny had to oversee everything.

The extent to which the children had been harmed only became apparent after their removal. For example, one of Nick's foster parents reported to OCS that she found seven-year-old Nick exhibiting inappropriate sexual behavior with his two-year-old brother. Nick disclosed during an interview that before he and Danny came into OCS custody, Stanley sat him down in front of the TV and showed him adult pornography while Stanley went into the bathroom for a couple of hours. When Stanley came out he said, "[W]asn't that great?" Nick's neuropsychological evaluation indicated that he should not be placed with his siblings. As a result, OCS placed Nick in foster care separate from his siblings, despite OCS policy.[6] Nick's foster parents also found

_____

[5] The court held a separate trial on the termination petition involving Stanley's parental rights to Carl, Adam, and Alanna. OCS presented evidence at Stanley's trial that he had been convicted of sexual abuse of a minor; that the prosecution had petitioned to revoke his probation four times after his conviction; and that he had elected to "flat time" his sentence, thereby avoiding supervised probation and the requirement that he undergo a sex offender assessment. The trial court found that Stanley remained an untreated sex offender and terminated his parental rights.

[6] *See Claudio P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 860, 862 n.5 (Alaska 2013) ("OCS's policy is to place siblings together, (continued...)

him to be troubled and confused when he arrived at their home. He lied and hid little things, and he was extremely depressed.

Jordan's case plan listed goals of individual therapy, parenting classes, anger management classes, and moderately supervised visitation with the children. Jordan was very uncooperative and argumentative, cursed and screamed at OCS social workers on the phone, and refused to participate in case planning meetings. Jordan also refused offers for a bus pass to visit the children and told her caseworker that she had undergone a mental health evaluation when she had not. Jordan continued to refuse to undergo recommended evaluations, and her combative behavior with OCS and the children's foster parents made it difficult to provide services. Jordan refused to follow OCS protocol and frequently called her caseworkers' supervisors instead of working directly with her caseworkers. OCS even received an anonymous phone call that Jordan was soliciting people on social websites to bomb OCS.

OCS changed its plan to include "agency-based visitation" because of Jordan's attitude during visitation. OCS also made unique accommodations for Jordan because of her work schedule, providing weekend visitation at extra expense. At one point early in the case, Jordan's caseworker documented his efforts to help Jordan and the family to date, and the document was extensive. Although Jordan did eventually take anger management and positive parenting classes, and she moved to Wasilla to be closer to her children, her belligerent behavior toward OCS and the children's foster families continued.

Jordan's caseworkers continued their efforts to reunite the family. They assisted Jordan with the counseling screening process and transportation to therapy, and

---

**6**(...continued)
whenever possible, in order to maintain their sibling bond.").

arranged transportation for visitation between Anchorage and the Mat-Su Valley. Alaska Family Services also worked with Jordan on family contact and parenting classes. OCS tried to place the children in Jordan's custody on several occasions. After Alanna was born in the summer of 2012, Alanna, Danny, and Nick were all living with Jordan. But the children were removed again after Jordan was hospitalized for a mental health episode, and the children were not doing well in her care. Danny was missing school, his grades had dropped, and his self-confidence was low. And OCS discovered significant scratches on the boys' bodies, which Danny explained were from fighting while unsupervised. Jordan said the scratches were from "normal roughhousing."

Jordan's caseworker drove to Wasilla to discuss with Jordan the case plan and available services. But Jordan refused to take any responsibility for the reason her children required services and instead blamed Stanley, her parents, and OCS employees. Despite frequent contact with Jordan, her caseworker was unable to make progress with her. Jordan had not changed and had not learned to surround herself with healthier, more stable people.

Jordan's inappropriate behavior and hostility toward OCS continued in 2014. For example, Danny reported exposure to sexual information and explicit images on Jordan's cell phone. When the social worker called Jordan to raise these concerns, Jordan escalated to yelling and then hung up.

### 3.    Jordan's mental health

OCS submitted into evidence the psychological evaluation of Jordan provided by Dr. Alfred Collins, who saw Jordan three times in 2013. Dr. Collins diagnosed Jordan with post-traumatic stress disorder and depressive disorder not otherwise specified, as well as personality disorder not otherwise specified, with borderline and histrionic features. Dr. Collins recommended continued individual therapy, as well as additional treatment including dialectical behavioral therapy.

Dr. Collins noted that Jordan relied on her children too much and tended to " 'parentify' them," which "ma[de] it difficult or impossible at times (especially when OCS seems to find fault with them) for her to see them realistically and to assess their needs accurately." The prognosis with the recommended therapy was "fair, certainly not hopeless." The report concludes:

> [Jordan] . . . might show considerable improvement through group and family therapy, if the principles of the therapy become internalized and are practiced with the help of her therapist over the next few years. Successful therapy might make it possible for her to parent successfully (of course with ongoing individual therapy and considerable OCS support) relatively soon, possibly even within six months. Essential will be [Jordan's] ability to accept OCS as primarily the children's allies, but also hers insofar as she demonstrates ability to move towards being a better parent. If she can do this, she will make progress.

Jordan's only witness was Glenna Jill Eblen, a behavioral health clinician with Mat-Su Health Services in Wasilla. At the time of trial, Eblen had been Jordan's therapist for 18 months. Eblen's diagnoses of Jordan were consistent with those of Dr. Collins. Eblen testified that, pursuant to Dr. Collins's recommendations, she planned to provide Jordan with dialectical behavioral group therapy and to continue with individual therapy. Eblen said that she and Jordan had developed a rapport, and Jordan's behavior had changed from volatile and angry to mellower and more trusting. Eblen's impression was that Jordan was not involved in a relationship with anyone, had a place to live, was looking for work, and was working to improve her mental health. Recognizing that she received her information from Jordan, Eblen felt that Jordan did not present a risk of harm to her children.

### 4. Danny's placement

At the time of trial, Danny was living with the Lewis family, who had known him for many years. There was testimony that Danny had bonded with the family, who hoped to adopt him. Danny had monthly visits with his biological siblings, but he did not want to talk to Jordan on the phone. He was uncomfortable during his visits with Jordan because of her behavior and their conversations. The OCS social worker who had worked on the case since 2012 testified that Danny was happy with the Lewis family and that returning him to Jordan's custody would harm him.

### 5. Nick's placement

At the time of trial, Nick was living with the McDonald family. Nick and Ted McDonald shared interests in camping, fishing, and Scouts. McDonald testified that Nick was disappointed in his visits with Jordan because she did not engage him in conversation or pay attention to him. The McDonald family arranged for Jordan to come to one of Nick's baseball games, but her behavior at the game was inappropriate.

Nick and his foster siblings enjoyed their time together and were affectionate toward each other. Nick and his biological siblings got together for barbeques and camping trips. There was testimony that the McDonald family wanted to adopt Nick and that Nick was eager for the adoption to be finalized. Testimony from OCS representatives confirmed that Nick was doing well with the McDonald family.

## B. Trial Court Findings

The trial court found that OCS had proved that Danny and Nick continued to be children in need of aid and that, from the time of OCS's initial involvement with the family to the termination trial, Jordan had not remedied the conduct or conditions that placed the children at risk. The trial court found that Jordan had subjected the children to a substantial risk of suffering sexual abuse as a result of leaving them in the care of a

registered and untreated sex offender,[7] and that Jordan's mental illness was of a nature and duration that placed the children at substantial risk of physical harm or mental injury.[8] The court further found that Jordan had failed to remedy the conduct that caused the children to be in need of aid; that OCS made timely, reasonable efforts toward reunification; and that termination was in the children's best interests.

## III.   STANDARD OF REVIEW

We review the superior court's factual findings for clear error and questions of law de novo.[9] Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the party prevailing below leaves us with a "definite and firm conviction that a mistake has been made."[10] "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[11]

---

[7]    Pursuant to AS 47.10.011(7), the trial court may find a child in need of aid if the court finds that the child has suffered sexual abuse or is at substantial risk of suffering sexual abuse, as a result of the parent's failure to adequately supervise the child, or if the parent allows the child to be left with a known sex offender.

[8]    Pursuant to AS 47.10.011(11), the trial court may find a child to be in need of aid if it finds that the child's "parent, guardian, or custodian has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury[.]"

[9]    *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012) (citing *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103-04 (Alaska 2011)).

[10]    *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010) (citation and internal quotation marks omitted).

[11]    *Sherman B.*, 290 P.3d at 428 (citation and internal quotation marks
(continued...)

## IV. DISCUSSION

### A. The Trial Court Did Not Clearly Err In Finding That Jordan Failed To Remedy The Conduct That Placed The Children At Substantial Risk Of Harm.

Before terminating parental rights, the trial court must find by clear and convincing evidence that the parent has not remedied the conduct or conditions in the home that place the child at substantial risk of harm.[12] Whether the parent has remedied the conduct and whether returning the child to the parent would place the child at risk are factual determinations.[13] In making a failure to remedy finding, the trial court may consider any fact relating to the best interests of the child, including: (1) the likelihood of returning the child to the parent within a reasonable time; (2) the parent's efforts; (3) the harm caused to the child; (4) the likelihood that the harmful conduct will continue; and (5) the history of conduct by or conditions created by the parent.[14]

The conduct of concern in this case was the children's exposure to a known and registered sex offender and Jordan's mental illness. Jordan argues that she has remedied her conduct or should have been given more time to do so.

The trial court concluded that Jordan had not adequately addressed her behaviors that placed the children at risk. The court's decision was based on findings that the children were still in need of aid because of Jordan's inability to take responsibility for her life and her continued association with men who were a risk to her children. The trial court also expressed concern that Jordan's behavior had not

---

[11](...continued)
omitted).

[12]    AS 47.10.088(a)(2).

[13]    *Barbara P.*, 234 P.3d at 1253.

[14]    AS 47.10.088(a)(2), (b).

improved; she had no plan and was not stable enough emotionally, mentally, or economically to care for her children; and she continued to fail to address those issues. The trial court addressed Dr. Collins's evaluation and his conclusions that Jordan still believed OCS was the cause of her problems. The trial court also based its decision on the children's success in their current placements and their lack of desire to live with their mother, in part because of her continued combative behavior.

Jordan contends that she removed the threat of sexual abuse and thus remedied the conduct described in AS 47.10.011(7) when she ended her relationship with Stanley, and she disputes OCS's theory that she has a pattern of involvement with sex offenders. Jordan also argues that any history of multiple relationships with sex offenders predates OCS's involvement and that there was no evidence of any problematic male partner since May 2011.[15] Jordan maintains that the trial court improperly ignored Eblen's testimony. She contends that by April 2012 she was "cooperating fully with OCS, working conscientiously on her plan requirements," and by the fall of 2012, she was "case compliant."

The trial court's finding that Jordan had not remedied her conduct, despite engaging in individual therapy and completing parenting classes, was based on her continuing failure to take responsibility for the impact of her actions — both past and present — on the children. Jordan largely ignores the other statutory factors and any other factors the court might have considered; "the amount of effort by the parent to remedy the conduct or the conditions" is only one factor the court might have considered pursuant to AS 47.10.088(b). There was evidence Nick's problems required the unusual

---

[15]     We find it noteworthy that, although Jordan maintained that she had ended her relationship with Stanley, and that their final reconciliation was in May 2011, Stanley is the biological father of Alanna, born in June 2012.

recommendation that he not be placed with his siblings. There was also evidence that Danny did not do well in his mother's care, even as late as the reunification trial in 2012.

The evidence supports the trial court's findings that Jordan's behavior remained combative and unchanged. Dr. Collins also identified as a problem Jordan's lack of insight into her role in causing harm to the children. Although Stanley may have been the sex offender and the one who actually exposed the children to pornography, Jordan created the opportunity for it to happen by leaving the children alone with Stanley. Jordan's continued behavior of allowing Danny to access her phone containing inappropriate content indicated that she still did not grasp the need for close supervision of "adult" material. Her failure to intervene when the boys fought also indicated a lack of understanding about her parental role in supervising her children. In addition, even if she did complete anger management, as she argues, her continuing behavioral problems with OCS and foster parents indicated that the classes were not effective. Jordan argues that the behavior changes OCS wanted her to make were more a matter of her personality, but Dr. Collins diagnosed Jordan with a personality disorder, indicating that Jordan's behaviors were in fact dysfunctional.

Even when a parent is compliant with her case plan, if she does not accept responsibility for the harm her behavior has caused and apply what she has learned in treatment, the trial court may properly find failure to remedy the conduct.[16] We see no

_____

[16]     *See, e.g.*, *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1009-12 (Alaska 2011) (affirming failure to remedy finding; father continued to place his own needs ahead of his child's needs, was not functioning at a level necessary to parent, had an extensive history of abuse and neglect of his older children, and had not accepted responsibility for the harm); *Barbara P.*, 23 P.3d at 1260 (affirming finding of failure to remedy; although mother formally complied with case plan by completing substance abuse treatment, staying sober since child's birth, and completing domestic violence and parenting education, the trial court found

(continued...)

mistake in the trial court's findings and thus conclude that Jordan failed to remedy her conduct.

B. **The Trial Court Did Not Err In Finding That OCS Made Reasonable But Unsuccessful Efforts To Reunite Jordan With Her Children.**

In CINA cases OCS must make "timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement."[17] Whether OCS made reasonable efforts is a mixed question of fact and law, requiring review of the factual questions under the clearly erroneous standard and legal questions using

---

[16](...continued)
no assurance that she would not fall back into her old dysfunctional ways); *V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198, 1208 (Alaska 2002) ("Compliance with treatment plans does not guarantee that parental rights will not be terminated because it cannot guarantee that adequate parenting skills will be acquired from the treatment regimen.").

[17] AS 47.10.086(a). Under this subsection, OCS is required to:

(1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;

(2) actively offer the parent or guardian, and refer the parent or guardian to, the services identified under (1) of this subsection; the department shall refer the parent or guardian to community-based family support services whenever community-based services are available and desired by the parent or guardian; and

(3) document the department's actions that are taken under (1) and (2) of this subsection.

independent judgment.[18] "In determining whether reunification efforts during a specific time period were reasonable, we look at the entire history of the services that OCS has provided a parent as well as the parent's level of cooperation with OCS's efforts."[19] A child's need for permanency also limits the length of time accorded to the parent to remedy her behavior.[20]

The trial court found that "since 2008, and up to the present, [OCS workers] have continued to make timely and reasonable efforts to provide [Jordan] support and therapy designed to prevent the out of home placement."

Jordan argues that OCS should have tried harder to help her succeed and should have better communicated what it would take to reunite with her family. Jordan further argues that OCS should have increased visitation and should have tailored the case plan to accommodate her needs.

We conclude that the trial court's finding of reasonable efforts is amply supported by the evidence. OCS worked with Jordan for years by developing the case plan and various safety plans; holding case planning meetings and team decision meetings; checking in on Jordan's progress, even when it meant driving to Wasilla; arranging transportation and visitation, including supervised visitation and weekend visitation at extra expense to accommodate Jordan's personality and her schedule; helping Jordan relocate; making referrals for Jordan to attend therapy; and assigning a secondary caseworker. Jordan also received services, including family contact and

---

[18]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012).

[19]     *Burke P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 162 P.3d 1239, 1245 (Alaska 2007) (citations omitted).

[20]     *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 56 (Alaska 2003).

parenting classes, through Alaska Family Services. OCS met with the children; made referrals for the children's evaluations and therapy; and worked to get Nick on prescribed medication, despite Jordan's refusal to cooperate.

We consider OCS's efforts more than reasonable, given Jordan's combative behavior toward her caseworkers and the children's foster parents. Moreover, OCS is not required to change the case plan if the parent's needs do not change over time.[21] We conclude that Jordan's arguments lack merit.

## C. The Trial Court Did Not Clearly Err In Finding That Termination Of Jordan's Parental Rights Was In The Children's Best Interests.

Before terminating parental rights to a child, the trial court must find by a preponderance of evidence that termination is in the child's best interests.[22] The trial court's best interests finding is a factual finding reviewed for clear error.[23] The trial court may consider the statutory factors listed in AS 47.10.088(b) to determine whether termination of parental rights is in the best interests of the child, as well as any other facts relating to the best interests of the child.[24] The trial court is not required to consider or give particular weight to any specific factor, including a parent's desire to parent or her

---

[21] *Christopher C. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 303 P.3d 465, 478 (Alaska 2013) (reasoning that while OCS social worker arguably should have updated the case plan more often to satisfy ICWA's active efforts requirement, the failure to do so was in part because the parent's needs did not change over the course of the case).

[22] CINA Rule 18(c)(3); *see also* AS 47.10.088(c).

[23] *Jamie H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1253, 1256 (Alaska 2014).

[24] *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1271 (Alaska 2014).

love for the child,[25] and may consider factors such as the bond between the child and his foster parents, the child's need for permanency, and the parent's lack of progress.[26]

The trial court found that termination of Jordan's parental rights was in the children's best interests because of their long history of involvement with OCS and foster care; Jordan's conduct, which at least in part caused visitation and foster placements to fail; and the children's need for stability. The trial court noted that despite Jordan's "paper progress," it was unlikely that the children would be returned to Jordan within a reasonable period of time and the children needed to move on to reach stability.

Jordan argues that she was showing signs of improvement and that, despite her acrimonious relationship with OCS and her abrasive manner, she had worked steadily to become a better parent. She argues that the trial court ignored her strong bond with Danny and Nick, and relied solely on the testimony of OCS workers who lacked expertise regarding her mental health.

While we commend Jordan in her efforts to attend therapy and parenting classes, we conclude that the record supports the trial court's decision. At the time of trial, Danny and Nick had finally settled into healthy, loving, permanent homes, and both were doing well. The trial court was entitled to rely on OCS representatives' testimony that Jordan had not improved her situation or her ability to parent and to find that the children needed to move on.

---

[25]   *Id.* (citation omitted).

[26]   *Id.* (citations omitted); *see also Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1263-64 (Alaska 2010) (upholding finding that termination was in children's best interests based on their need for permanency, stability in their foster home, and the fact that neither biological parent would be ready to care for the children on a full-time basis within a reasonable period of time).

**D.     Jordan Did Not Receive Ineffective Assistance Of Counsel.**

Before OCS finished its case-in-chief, Jordan left the courtroom and did not return.  Her attorney told the court she had planned to present Jordan as a witness, but that Jordan found the experience too painful.  Jordan's attorney told the court she did not know how to proceed, so she would let OCS put on its evidence and then she would tell the court what she had planned to offer as evidence.  At the end of trial, the attorney opted not to provide a closing statement and informed the court that Jordan had left her no direction; she simply told the court that although Jordan may not have been able to make all necessary changes in her life, she had given it her best shot.

Jordan challenges her attorney's decisions to present only one witness during the three-day trial, as well as her failure to present a comprehensive closing argument.  Jordan also argues that because the record does not contain a full account of her attorney's work and does not fully document the relationship, the matter should at least be remanded for an evidentiary hearing.

We apply a two-pronged test to determine whether a parent has raised a successful ineffective assistance challenge:

> Under the first prong, the litigant must show that her attorney's performance was below a level that any reasonably competent attorney would provide, bearing in mind that "reasonable tactical decisions are virtually immune from subsequent challenge even if, in hindsight, better approaches could have been taken."  Under the second prong, the litigant must demonstrate that counsel's improved performance would have affected the outcome of the case.[27]

We conclude that Jordan has failed to demonstrate that her attorney was ineffective. First, it is difficult to imagine how Jordan's attorney's decision not to present a

---

[27]     *Chloe W.*, 336 P.3d at 1265 (footnotes and citations omitted).

comprehensive closing argument would not be considered tactical. Jordan exited the courtroom mid-trial, leaving her attorney confused about which direction to take and without clarifying whether she wished to relinquish her parental rights to her older boys as she had her other children, or to continue to contest the termination. While closing argument may serve an important trial function, counsel may waive it as a tactical decision without the decision amounting to ineffective assistance.[28] Thus Jordan has not established the first prong.

Nor is there any indication that Jordan's attorney's different performance would have affected the outcome of the case.[29] Even if Jordan's counsel had presented a closing argument contending that the trial court should have weighed the evidence in her favor, there is no indication that her counsel would have convinced the trial court to rule in Jordan's favor. The court made clear that it carefully considered and weighed all of the evidence in the case. We therefore conclude that Jordan's claim of ineffective assistance of counsel must fail.

## V. CONCLUSION

For the reasons set forth above, we AFFIRM the decision of the trial court.

---

[28] *See Bell v. Cone*, 535 U.S. 685, 700-02 (2002) (holding that counsel's decisions not to call defendant as a witness, not to recall other witnesses, and to waive final argument were within the permissible range of competency).

[29] *Chloe W.*, 336 P.3d at 1267.