NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| DAWN B., | ) |
| | ) Supreme Court No. S-17028 |
| Appellant, | ) |
| | ) Superior Court Nos. 3NA-15-00002/ |
| v. | ) 00003/00004/00005/00006 CN |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | ) AND JUDGMENT* |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| | ) No. 1722 – May 29, 2019 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Naknek, Christina Reigh, Judge.

Appearances: Elizabeth D. Friedman, Law Office of Elizabeth D. Friedman, Redding, California, for Appellant. Aisha Tinker Bray, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I. INTRODUCTION

A mother appeals the termination of her parental rights to her five Indian children.[1] The superior court found the children in need of aid because of the mother's

---

\* Entered under Alaska Appellate Rule 214.

[1] Indian Child Welfare Act (ICWA), 25 U.S.C. § 1903(4) (2018) (defining
(continued...)

neglect, substance abuse, mental illness, and posed risk of mental injury to the children. The court found that the mother failed to remedy the conditions that placed the children in need of aid when, rather than completing her case plan, she moved to Montana and upon returning failed to engage in the recommended services. The court found that the Office of Children's Services (OCS) made active efforts, specifically working with the mother to arrange local options for completing her case plan. And the court found that the mother's continued custody of the children would likely result in serious physical and emotional damage to the children because her cognitive and emotional condition had not changed since the children were taken into custody. Because the superior court did not err in any of these findings, we affirm the termination of the mother's parental rights.

## II.    FACTS AND PROCEEDINGS

Dawn B. is the biological mother of five daughters — Amy, Violet, Sierra, Kate, and Samantha.[2]  Dawn lived in Nondalton for many years, although she is a member of Fort Belknap Tribe of Montana. Evan B., her now-deceased husband, is Amy's adoptive father and the biological father of the four younger children. He was a member of the Nondalton Village (The Tribe). The children are also members of this tribe.

In 2006 OCS initially became involved with the family; OCS received a total of 13 reports of harm between 2006 and 2015. In 2006 OCS received reports that Evan was drinking excessively while caring for the children. OCS thereafter "partnered with the Tribe and local service providers to conduct safety checks." According to OCS, there were no more reports until January 2012, when OCS was informed that Evan had

---

[1](...continued)
"Indian child").

[2]      Pseudonyms are used to protect the family members' privacy.

consumed a significant amount of alcohol and then driven with his three-year-old daughter. In March and April 2012, while Dawn was in Anchorage giving birth to Samantha, and the other children were in Evan's care, OCS received multiple reports about Evan drinking while caring for them. OCS met with Evan and the children and discovered that all four children had blisters and sores on their feet from before Dawn left for Anchorage.

Following a May 2013 report of harm, OCS and Dawn met and discussed the services she was receiving. In September 2013 OCS received a report that Dawn was "smoking pot with her 12-year-old daughter [Amy] and leaving baby [Samantha] alone with the 4- and 6-year-old on a daily basis." According to an October report, Dawn appeared intoxicated and smelled heavily of marijuana while at the clinic in Nondalton with Samantha; OCS subsequently met with Dawn, who stated that she had been stressed and smoked marijuana to calm her nerves. According to a March 2014 report, Evan became highly intoxicated and physically pushed Dawn, becoming so aggressive that she locked herself in the bedroom with the children.

A March 2015 report alleged a number of safety issues, including domestic violence in the home. The OCS caseworker responding to the report saw bottles scattered around the yard, found Evan intoxicated, and observed him screaming, yelling, and storming through the house. The OCS caseworker helped Dawn call family members in Montana, who were aware of the problems with Evan's drinking and were willing to help Dawn and the children relocate to Montana; OCS also informed the troopers that Dawn might need assistance. Although Dawn expressed willingness to go back to Montana, she later reported to the troopers that OCS was forcing her to leave Alaska. According to OCS, Evan "had much difficulty remaining sober" and was often "intoxicated to the point that he . . . physically neglected the children by lack of supervision." OCS created a

safety plan with Dawn that had several options to avoid leaving the children in Evan's care: OCS would pay for her to travel to stay at a shelter in Dillingham; in Nondalton she could leave the children with several teachers who had offered to care for them; or Dawn's mother would provide airfare for Dawn to move to Montana.

In April Dawn left the children in Evan's care for two weeks, during which time OCS, the Tribe, and the local clinic and school all monitored the children. An OCS caseworker visited the home in May and explained to Dawn its concerns regarding the children being left alone with Evan; Dawn said she understood. OCS also warned Dawn that if she left the children in Evan's care again, OCS would take them into custody.

In June Dawn left the children in Evan's care while she was working as a firefighter elsewhere in Alaska; Evan reportedly was drinking and the children were unsupervised and crying. OCS took emergency custody of the children. The superior court found that the children were "in distress," "extremely unclean and without clothing that fit properly," and "the youngest child's hair was caked with dirt and honey." The oldest "was consistently smoking marijuana that she had gotten from her mother," the middle three children had a "flat affect" and were "very unkempt," and the youngest child "did not speak with words, but would just screech, and was inconsolable."

The children were placed in a relative's home minutes away from their mother's home. The OCS caseworker who had worked with the family for four months before the children were taken into custody did not recognize them after they had been in foster placement for a month because "their physical appearances had changed so much" — "they were clean, they appeared to have gained weight. [She] physically did not recognize them."

Dawn was provided with a generous visitation schedule, including daily school and foster home visits; she also was allowed to visit her children when she saw

them in the village.  But she did not visit regularly.  Dawn underwent a substance abuse and mental health assessment in August, which included a cannabis dependence diagnosis and recommendation that she receive outpatient treatment because partial hospitalization or day treatment were not available in Nondalton.

Evan died in December 2015.

Dawn underwent a psychological evaluation by Dr. Michael Rose, a clinical psychologist, in February 2016.  Dr. Rose concluded, among other things, that although Dawn "expects to be able to reunify with her children in the near future, the assessment findings do not support this plan due to the severity of cognitive and psychological problems she presents."  Dr. Rose also concluded that Dawn is "at risk to behave in a neglectful and/or abusive fashion toward her children, and she needs assistance in learning and mastering parenting skills."  OCS finalized a case plan that became effective in June.  In July Dawn left the state and moved to Montana.

Dawn lived in Montana for almost a year, during which she was inconsistent in contacting her children missing many scheduled phone calls with her children.  She later testified that she underwent counseling and completed treatment while in Montana, but she did not provide proof of this treatment to OCS.  OCS was not able to independently confirm any details about the treatment, whether Dawn completed it, or whether it comported with the psychologist's recommendations.

Dawn moved back to Nondalton in March or April 2017.  She told OCS upon her return that she had not used drugs for several months after completing treatment in Montana.  She agreed to a urinalysis test, which yielded positive marijuana results, after which she told OCS that "she had smoked [marijuana] a couple of days earlier because she was stressed."  Although Dawn claimed she returned to Nondalton to reunite with her children, she had limited contact with them after her return.  Over nearly a year,

she visited her children at most only a few times, one of which was during Thanksgiving, and this was only after Amy went to Dawn's house and invited her to Thanksgiving dinner.

The termination trial was held over two days in February and March 2018. The following six people testified: the two OCS caseworkers who had worked with the family, Dr. Rose (expert witness), Amy (oldest daughter), Dawn, and Dawn's boyfriend. The superior court made findings and issued an order terminating Dawn's parental rights in March 2018. Dawn appeals the following findings: that her "conduct placed her children at a substantial risk of mental injury by exposure to domestic violence"; that she "subjected her children to neglect"; that her "ability to parent was substantially impaired by marijuana use"; that her "intelligence level and emotional problems placed her children at substantial risk" of injury; that she "failed to remedy the conduct or conditions that brought the children into custody"; that her "continued custody of the children would result in serious" damage to the children; and that OCS made active efforts as required by ICWA.

## III. STANDARD OF REVIEW

When terminating parental rights under ICWA, the superior court "must find by clear and convincing evidence that the child has been subjected to conduct or conditions described in AS 47.10.011; that the parent has not remedied, or has not remedied within a reasonable time, the conduct or conditions in the home that place the child at substantial risk of physical or mental injury; and . . . that active but unsuccessful efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[3] The superior court also must find

---

[3]     *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, (continued...)

"by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[4]  Finally, the court "must determine by a preponderance of the evidence that 'termination of parental rights is in the best interests of the child.' "[5]

The superior court's factual findings are reviewed for clear error.[6]  Factual findings are clearly erroneous if, after reviewing the entire record, we are left with "a definite and firm conviction that a mistake has been made."[7]  "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh the evidence when the record provides clear support for the superior court's ruling."[8]  Whether active efforts have been made as required under ICWA is a mixed question of fact and law.[9]  We review questions of law de novo.[10]

---

[3](...continued)
336 P.3d 1258, 1264 (Alaska 2014) (footnotes omitted).

[4]       25 U.S.C. § 1912(f) (2018).

[5]       *Chloe W*, 336 P.3d at 1264 (quoting CINA Rule 18(c)(3)).  Dawn does not challenge the superior court's best interests finding, and we do not discuss it further.

[6]       *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 948-49 (Alaska 2013); *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 962 (Alaska 2013).

[7]       *Chloe W.*, 336 P.3d at 1264 (quoting *Sherman B.*, 290 P.3d at 427-28).

[8]       *Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 167 (Alaska 2015) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)).

[9]       *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's*
(continued...)

## IV.    DISCUSSION

### A.    The Superior Court Did Not Clearly Err By Finding That The Children Were In Need Of Aid.

The superior court found the children in need of aid under AS 47.10.011(8) (risk of mental injury), (9) (neglect), (10) (substance abuse), and (11) (parent's mental illness).  Dawn appeals three of these findings but has not meaningfully challenged the superior court's neglect finding.  Dawn challenged the neglect finding in her issues presented for review in her opening brief, but does not include any supporting argument until her reply brief.[11]  We have held that when a parent challenges some, but not all, of the superior court's CINA findings, based on the unchallenged finding we may affirm the court's determination that the children were in need of aid.[12]  Although the unappealed neglect finding provides adequate grounds to affirm the superior court's CINA determination, because the neglect finding is related to the court's other findings we have thoroughly examined the record and conclude there is overwhelming evidence of neglect beginning long before the termination trial and continuing through it.

Under AS 47.10.011(9), a child is in need of aid if "conduct by or conditions created by the parent . . . have subjected the child or another child in the same household to neglect."  The superior court found that Dawn neglected the children by leaving them

---

[9](...continued)
*Servs.*, 254 P.3d 1095, 1104 (Alaska 2011).

[10]    *Id.*

[11]    *Barnett v. Barnett*, 238 P.3d 594, 603 (Alaska 2010) ("[W]e deem waived any arguments raised for the first time in a reply brief.").

[12]    *Doug Y. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 243 P.3d 217, 224 (Alaska 2010).

in their father's care, despite being aware of the problems associated with his care, and that OCS had created a safety plan for the children to be cared for elsewhere. The court found that when the children were taken into custody, they were malnourished, dirty, and suffered from bedbug bites. The neglect was so severe that after a month of being in custody the children's "physical appearances had changed so much" — including weight gain and being clean — that the family's OCS caseworker did not recognize them. The court found that the two children who had individual education plans through their school had unmet needs while in Dawn's care, but showed significant improvements after being taken into custody.

The superior court also found that Dawn neglected the children while they were in OCS custody because she failed to have regular contact with them despite the "ideal visitation schedule" she was provided. She spent little time with the children despite being allowed daily visits at the school and in the foster home, which was a two-minute walk from where she lived. She was also allowed to visit with her children when they were out and about in the village, but when they saw her, "she would not approach them or talk to them." The court found that "[a]t the time she should have been getting her children back, [Dawn] chose to leave the village to move to Montana for almost a year." Dawn also missed many of her scheduled phone calls with the children while in Montana, and her contact with the children declined after returning from Montana. The court found that Dawn's "disinvolvement . . . affected the children, leading them to feel rejected by their mother."

In her reply brief, Dawn argues that the superior court erred in its neglect finding. Dawn argues that the finding that she neglected her children by leaving them with Evan when she left the village temporarily to work as a firefighter was rebutted by her explanation that, due to their financial situation and Evan's disability, she had to

"accept the paid employment which was not available in the village."  She argues that "OCS had not made it clear to her that her children would be taken if they were left with their father."  Regarding her failure to visit her children after they were taken into custody, she argues that she was afraid of the foster family's large dog, and she did not feel welcome in the foster home.  She argues that she initially "did visit with the children at school" but that the new principal the next school year did not allow her to continue to do so.  She also argues that the children should have been allowed to visit her at her home and that "the social dynamics of village life," with her being "an outsider," "made it impossible for [her] to maintain a relationship with the children."

Dawn's arguments are unpersuasive.  Her explanation for why she needed to leave the village to work does not explain why she chose not to follow the safety plan OCS had developed with her for the children to be cared for elsewhere if she had to leave.  As to her argument that "OCS had not made it clear to her that her children would be taken if they were left with their father," Dawn admitted in her testimony that OCS told her it would take her children into custody if she left them with Evan when she went firefighting.  And as to her explanations regarding her failure to visit her children, the visitation schedule made available to her was, as the superior court found, "ideal."  Contrary to Dawn's claim about the new principal not allowing her to visit the children at school, testimony indicates that the new principal became aware of the visitation schedule for Dawn and that she remained able to visit during lunchtime and "any time she wanted to help out in the classroom."

Because the evidence of neglect is overwhelming, the superior court did not clearly err by finding the children in need of aid under AS 47.10.011(9).

**B.** **The Superior Court Did Not Clearly Err By Finding That Dawn Failed To Remedy The Conduct Or Conditions That Placed The Children In Need Of Aid.**

In finding that Dawn failed to remedy the conduct or conditions that placed the children in need of aid, the superior court noted the four goals in Dawn's case plan: to "(1) have a safe, stable, and alcohol- and drug-free home; (2) increase her knowledge about parenting and her children's special needs; (3) address substance abuse treatment and mental health therapy; and (4) increase attendance at visitations and appointments for services." The court acknowledged she completed some tasks by undergoing a substance abuse assessment and psychological evaluation and by engaging in "some of her visitations." The court noted her testimony about attending counseling and classes in Montana but found that, despite OCS's efforts to confirm the information, "OCS was unable to ascertain whether [Dawn] completed any of the courses she said she completed." The court found that Dawn "continued to use marijuana and . . . failed to engage with her children" after returning to Alaska. The court found that she had "very open visitation opportunities" but that she "chose not to take advantage of" them and instead "blamed her lack of visitation on everyone else — including her children." Finally, the court found that the children had been in OCS custody for 33 months and that Dawn had "been given ample time to remedy her situation, but ha[d] failed to do so."

Dawn argues that she met the first goal to have a safe home by "rid[ding] the home of bedbugs" and "declutter[ing] it" and that "there was no further domestic violence." She also argues that "she had cut down on her marijuana use" and that "[t]here was no showing that [she] was chronically intoxicated on marijuana since her return from Montana." Regarding the second goal to increase her parenting knowledge, Dawn argues that she and her boyfriend both testified that she took a parenting class while in Montana but that "OCS negligently failed to obtain the documentation from the

Montana providers." She also argues that "OCS failed to provide [her] with the specialized one-on-one parenting that Dr. Rose recommended." As to the third goal to address her health, Dawn argues that she "attended counseling and substance abuse treatment in Montana but OCS failed to follow through and obtain records or documentation from the providers." Regarding the fourth goal to increase visitation, Dawn states that she "felt 'uncomfortable' visiting in the foster parent's home and felt 'negative stuff' in the home" but that she made "efforts to visit [the children] at school"; she argues that "[s]he was thwarted from visiting in the school," that "the ICWA worker made no efforts to help her," and that "the kids would scatter and not want to visit with her" when she went to the foster home.

Even if Dawn had decluttered and rid the home of bedbugs, and even if there were no concerns about ongoing domestic violence given Evan's death, the goal of having a drug-free home was not met. The superior court did not clearly err in finding that Dawn was "a chronic marijuana user." The court specifically found that she was not "forthright with her marijuana use" because she claimed to be drug-free upon her return from Montana and only after a positive drug test admitted to having smoked marijuana again a couple of days earlier; these findings are supported by trial testimony. As to Dawn's argument that "OCS negligently failed to obtain the documentation from the Montana providers," the court's finding that OCS made efforts to obtain the records but was unsuccessful is supported by the record. One of the OCS caseworkers testified that she did not receive much information from the facility in Montana. She testified that she asked for more information and explained to Dawn that OCS needed more detail about the classes, including what was covered, how many sessions she attended, and whether she completed the classes, but that it took OCS months to obtain this information and that "it was still very vague"; the caseworker testified that the providers "sent [her] the same

letter like three times." Regarding the one-on-one parenting coaching, an OCS caseworker testified that she talked with the local ICWA social worker about serving as a parenting coach for Dawn, that she "made a template for them" to do the parenting coaching, but that Dawn moved to Montana before the coaching plan could be implemented. Finally, Dawn's arguments about the fourth goal reflect exactly what the court found: that she "blamed her lack of visitation on everyone else — including her children."

Based on our review of the record, the superior court did not clearly err by finding that Dawn failed to remedy the conduct or conditions that placed the children in need of aid.

C. **The Superior Court Did Not Err By Finding That OCS Made Active Efforts As Required Under ICWA.**

In cases involving Indian children, OCS must prove by clear and convincing evidence "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[13] The recently updated federal regulations addressing active efforts explain that active efforts "means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[14] "Generally, 'OCS makes active efforts . . . when it helps the parents develop the resources necessary to satisfy their case plans, but its efforts are passive when it requires the parents to perform these tasks on their own.' "[15] In determining whether

---

[13] 25 U.S.C. § 1912(d) (2018). CINA Rule 18(c)(2)(B).

[14] 25 C.F.R. § 23.2 (2019).

[15] *Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's*
(continued...)

active efforts were made, "[t]he court should look to OCS's involvement in its entirety, and may consider a parent's demonstrated unwillingness to participate in treatment as a factor."[16]

The superior court found that OCS made reasonable and active efforts both before and after the children were taken into OCS custody. The court found that "OCS worked with the family for several years" before the children were taken into custody. The court specifically found that "[i]n March 2015, OCS worked with [Dawn] to create a safety plan to avoid taking the kids into custody," which allowed for multiple options to keep the children safe. The court also found that OCS made the following efforts after taking the children into custody: OCS worked with Dawn to create a case plan, referred her for a substance abuse and mental health assessment, coordinated a psychological assessment, referred her for counseling, "prepared a one-on-one parenting manual for the ICWA [social] worker and [Dawn] to work on together," went to the village to visit the family, "placed the children with a family member in their home village," "allowed for open and frequent visitation between mother and children," "coordinated counseling and special education services for the children," and "attempted to coordinate with service providers in Montana." The court found that these efforts ultimately were unsuccessful.

Dawn argues that OCS's case plan failed to account for her intellectual disabilities, that OCS failed to provide cognitive behavior therapy even though it was recommended, and that OCS failed to obtain records of Dawn's treatment in Montana.

_____

[15](...continued)
*Servs.*, 365 P.3d 345, 350 (Alaska 2016) (alteration in original) (quoting *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432 (Alaska 2015)).

[16]      *Id.* (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 271 (Alaska 2011)).

She argues that the safety plan had not been "communicated to [her] in a way that she was cognitively capable of understanding" and that the ICWA social worker who would provide her one-on-one parenting training was not qualified and lacked "any expertise in parenting children with disabilities or teaching a parent with disabilities." She also argues that the social worker "never actually reached out to assist her" and only "gave her some parenting books after the case had been going on for a year."

Contrary to Dawn's assertion, OCS accounted for her intellectual disabilities. OCS referred her for a substance abuse and mental health assessment and coordinated her psychological assessment. In light of the recommendation to attend individualized parenting classes, OCS prepared a one-on-one parenting manual for the ICWA social worker and Dawn to work on together. Dawn argues that this one-on-one parenting training never came to fruition, but trial testimony indicates that the parenting coaching was set up "just before [Dawn] left" for Montana; after Dawn returned about nine months later, the OCS caseworker and ICWA social worker both met with her, and the social worker "agreed that she would work with [Dawn]" on the parenting coaching. At that point, Dawn believed she had completed her case plan requirements while in Montana, "did not think she needed any more help," and failed to engage with or visit her children. The caseworker testified that even "getting her to commit to an assessment of any sort was difficult," and Dr. Rose testified that Dawn "believ[ed] that she [could] handle her problems by herself and [did] not need assistance." In light of Dawn's resistance and lack of engagement, the court did not err by concluding that active efforts were made.

**D.** **The Superior Court Did Not Clearly Err By Finding That Dawn's Continued Custody Of The Children Was Likely To Result In Serious Emotional Or Physical Damage To The Children.**

OCS was required to prove "by evidence beyond a reasonable doubt, including the testimony of qualified expert witnesses, that continued custody of the child by the parent . . . [was] likely to result in serious emotional or physical damage to the child."[17] Dr. Rose, who was recognized at trial as a qualified expert witness, testified regarding Dawn's cognitive and psychological deficits, concluding that they were substantial and would make it very difficult for her to effectively parent. The superior court found that Dawn "did not engage in the services recommended by Dr. Rose, and instead insisted that she could handle her problems on her own." Consequently, she did not avail herself of "the assistance she need[ed] to prevent further harm to her children." Furthermore, "she did not change her behaviors" but "continued to smoke marijuana, . . . failed to visit with her children, and did not gain the skills she needed [to] create an environment that would not subject her daughters to neglect." The court found that Dawn was "in the same cognitive and emotional position that she was in when the children were taken into custody" and that "continued custody of the children by [Dawn] [was] likely to result in serious emotional or physical damage to the children."

Dawn argues that "Dr. Rose's opinion was a self-fulfilling prophecy" and that OCS "admitted in its closing that even if [Dawn] had completed her case plan that it still wouldn't have been enough unless she demonstrated some undefined 'behavior change.'" She argues that she "had changed her behavior" because she "was no longer a victim of domestic violence" and was "in a positive relationship." She argues that "[t]here was no expert testimony about the children and their needs and how [she] was

---

[17]     25 U.S.C. § 1912(f) (2018). CINA Rule 18(c)(4).

unable to meet the needs" and that Dr. Rose "never assessed the children." She argues that "[t]here was no testimony about [her] interaction with the children" and that she chose to return to Nondalton from Montana "to reunite with her children."

The superior court's findings are supported by the record, which shows that Dawn did not engage in the recommended services and failed to alter her behavior. Although she maintains that she could handle her problems on her own, she continued to use marijuana, did not visit with her children, and failed to gain needed parenting skills. Because Dawn did not engage in the recommended services, she did not meet OCS's many concerns, and did not develop parenting skills or the ability to make safe decisions regarding her children. As to the argument about Dawn's psychological evaluation not including an assessment of the children, it is unclear why Dawn believes this was necessary as part of her evaluation.

The lack of testimony about Dawn's interaction with her children was due to her lack of interaction with the children. The court found that Dawn "had very open visitation opportunities" but "continually made excuses or blamed others for not seeing her kids." The sparse testimony about Dawn's limited interaction with her children included a statement by an OCS caseworker that one of the children had "made the comment that their mom actually turns the other way when she sees them coming down the road." The caseworker also testified that the children told her they would run away if returned to Dawn's care. And despite Dawn's argument that she returned to Nondalton to be with her children, trial testimony shows that between her return from Montana in March or April 2017 and the termination trial in February and March 2018, she only visited her children a few times at most.

In light of the record, the superior court did not clearly err by finding that Dawn's continued custody of the children was likely to result in serious emotional or physical harm.

## V. CONCLUSION

We AFFIRM the superior court's order terminating Dawn's parental rights.